**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

JOSE LUIS CIRINO MATOS,

                                        Plaintiff,

                    - v -                                        Civ. No. 5:14-CV-0834
                                                                        (GTS/DJS)

CAROLYN W. COLVIN, *Acting Comm'r of Social Security*,

                                        Defendant.

**APPEARANCES:**                                        **OF COUNSEL:**

OLINSKY LAW GROUP                                HOWARD D. OLINSKY, ESQ.
Attorney for Plaintiff
300 S. State Street
5th Floor, Suite 520
Syracuse, New York 13202

SOCIAL SECURITY ADMINISTRATION          JEREMY A. LINDEN, ESQ.
Attorney for Defendant
Office of Regional General Counsel
Region II
26 Federal Plaza – Room 3904
New York, New York 10278

**DANIEL J. STEWART**
**United States Magistrate Judge**

## REPORT-RECOMENDATION and ORDER

Plaintiff Jose Luis Cirino Matos brings this action, pursuant to 42 U.S.C. § 405(g), claiming

that the Commissioner of Social Security improperly denied his applications for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons that follow, this Court

recommends that the Commissioner's decision denying Social Security benefits be affirmed.

# I. BACKGROUND

## A. Facts

Matos, born on January 20, 1965, was forty-five years old when he protectively filed his applications for disability benefits on November 29, 2010. Dkt. No. 12, Admin. Tr. [hereinafter "Tr."], at p. 79. Mr. Matos was born in Puerto Rico, and has a fourth grade education. *Id.* at p. 47. He lives with his twenty-two-year-old son, and last worked as an assembler in a company that manufactured electrical equipment. *Id.* at pp. 46 & 48. Generally, Mr. Matos alleges disability due, but not limited to, back pain, disc degeneration, depression, encephalomacia, hernia, hyperlipidemia, hypertension, irritable bowel syndrome ("IBS"), migraines, and mental retardation. *Id.* at p. 81.

## B. Procedural History

On November 29, 2010, Plaintiff protectively applied for disability benefits, alleging an onset disability date of July 1, 2003. Tr. at pp. 243 & 248. His application was initially denied on April 12, 2011. *Id.* at pp. 67-69. A hearing was held before Administrative Law Judge ("ALJ") Milagros Farnes. *Id.* at pp. 38-66. On March 1, 2013, the ALJ denied Plaintiff's request for Social Security benefits. *Id.* at pp. 79-91. On May 7, 2014, the Appeals Council denied Plaintiff's request for review, thus rendering the ALJ's decision the final decision of the Commissioner. *Id.* at pp. 5-12. After seeking an extension of time to file a civil action, Plaintiff brought this timely appeal. *Id.* at pp. 1-2.

# II. DISCUSSION

## A. Standard of Review

Under 42 U.S.C. § 405(g), the proper standard of review for this Court is not to employ a *de novo* review, but rather to discern whether substantial evidence supports the Commissioner's

findings and that the correct legal standards have been applied. *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *Urtz v. Callahan*, 965 F. Supp. 324, 325-26 (N.D.N.Y. 1997) (citing, *inter alia*, *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Succinctly defined, substantial evidence is "more than a mere scintilla," it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938).

The ALJ must set forth the crucial factors supporting the decision with sufficient specificity. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Where the ALJ's findings are supported by substantial evidence, the court may not interject its interpretation of the administrative record. *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); 42 U.S.C. § 405(g). Where the weight of the evidence, however, does not meet the requirement for substantial evidence, or where a reasonable basis for doubt exists as to whether the correct legal principles were applied, the ALJ's decision may not be affirmed. *Johnson v. Bowen*, 817 F.2d at 986.

## B. Determination of Disability

The SSI program, 42 U.S.C. § 1381, *et seq*., is a federal program providing benefits to needy aged, blind, or disabled individuals who meet the statutory income and resource limitations. 20 C.F.R. § 416.110. The SSI program was designed to replace the former federally assisted state welfare programs for the aged, blind, or disabled. *Id*. While the SSI program has special eligibility requirements that relate to establishing need,[1] the requirements for establishing disability, found at 42 U.S.C. § 1382c, are identical to the requirements under Title II of the Social Security Act for entitlement to disability insurance benefits. *See* 42 U.S.C. § 423(d). Therefore, the vast case law

---

[1] SSI benefits may not be paid unless the claimant meets the income and resource requirements of 42 U.S.C. §§ 1382a, 1382b, and 1382c(a)(3)(A).

interpreting the disability provisions under Title II may be relied upon in this case. *See Donato v. Sec'y of Health and Human Servs.*, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (noting that decisions under Titles II and XVI are cited interchangeably).

In determining whether a claimant is disabled, the Commissioner follows a five-step analysis set forth in the Social Security Administration Regulations. 20 C.F.R. §§ 404.1520 & 416.920. At Step One, the Commissioner "considers whether the claimant is currently engaged in substantial gainful activity." *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). If the claimant is engaged in substantial gainful activity, he or she is not disabled and the inquiry ends. 20 C.F.R. §§ 404.1520(b) & 416.920(b). If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and assesses whether the claimant suffers from a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. *Id.* at §§ 404.1520(c) & 416.920(c). If the claimant suffers from a severe impairment, the Commissioner considers at Step Three whether such impairment(s) meets or equals an impairment listed in Appendix 1, in Part 404, Subpart P of the Regulations. *Id*. at §§ 404.1520(d) & 416.920(d). The Commissioner makes this assessment without considering vocational factors such as age, education, and work experience. *Berry v. Schweiker*, 675 F.2d at 467. Where the claimant has such an impairment the inquiry ceases as he or she is presumed to be disabled and unable to perform substantial gainful activity. *Id*. If the claimant's impairment(s) does not meet or equal the listed impairments, the Commissioner proceeds to Step Four and considers whether the claimant has the residual functional capacity ("RFC")[2] to perform his or her past relevant work despite the existence

---

[2] "Residual functional capacity" is defined by the Regulations as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is what you can still do despite your limitations." 20 C.F.R. §§ 404.1545(a) & 416.945(a).

of severe impairments. 20 C.F.R. §§ 404.1520(e) & 416.920(e). If the claimant cannot perform his or her past work, then at Step Five, the Commissioner considers whether the claimant can perform any other work available in the national economy. *Berry v. Schweiker*, 675 F.2d at 467; 20 C.F.R. §§ 404.1520(g) & 416.920(g).

Initially, the burden of proof lies with the claimant to show that his or her impairment(s) prevents a return to previous employment (Steps One through Four). *Berry v. Schweiker*, 675 F.2d at 467. If the claimant meets that burden, the burden then shifts to the Commissioner at Step Five to establish, with specific reference to medical evidence, that the claimant's physical and/or mental impairment(s) are not of such severity as to prevent him or her from performing work that is available within the national economy. *Id.*; 42 U.S.C. § 423(d)(2)(A); *see also White v. Sec'y of Health and Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990). In making this showing at Step Five, the claimant's RFC must be considered along with other vocational factors such as age, education, past work experience, and transferability of skills. 20 C.F.R. §§ 404.1520(f) & 416.920(f); *see also New York v. Sullivan*, 906 F.2d 910, 913 (2d Cir. 1990).

### C. ALJ Milagros Farnes's Findings

Using the five-step disability evaluation, the ALJ found that: 1) Mr. Matos had not engaged in any substantial gainful activity since July 1, 2003, the alleged onset disability date; 2) he has severe medically determinable impairments, namely, depressive disorder NOS; encephalomalacia; hiatus hernia; hyperlipidemia; hypertension; IBS; recurrent moderate migraine headaches; lumbar disc degeneration; a rule-out of mild mental retardation; and possible borderline intellectual functioning/low intelligence quotient ("IQ"); 3) his severe impairments do not meet nor medically equal any impairment listed in Appendix 1, Subpart P of Social Security Regulation Part 404; 4)

Plaintiff retained the RFC to perform a range of light work on a sustained basis with certain limitations, and as such could perform his past relevant work as an assembler as this work is generally performed in the national economy. *Id*. at pp. 81-91. Thus, the ALJ determined that the Plaintiff was not disabled. *Id*. at p. 91. After reviewing the administrative transcript, this Court finds that the ALJ applied the correct legal standards and his findings are supported by substantial evidence in the record.

### D. Plaintiff's Arguments

Plaintiff contends that the Commissioner's decision should be reversed and judgment should be granted on the record in Plaintiff's favor because 1) the ALJ's RFC is not supported by substantial evidence; 2) the ALJ improperly assessed Plaintiff's credibility; 3) the ALJ's Step Four determination was unsupported by substantial evidence; and 4) the Appeals Council erred when it denied review. Dkt. No. 13, Pl.'s Br., at p.1. The Court will consider each of these contentions.

### 1. The RFC Determination

As noted above, the Commissioner assesses a claimant's RFC as a basis for determining the particular types of work the claimant may be able to do despite the existence of physical and/or mental impairments. *See* 20 C.F.R. §§ 404.1545(a) & 416.945; 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(c). In qualifying work in the national economy, the Regulations classify and define jobs according to their physical exertion requirements as sedentary, light, medium, heavy, and very heavy. 20 C.F.R. §§ 404.1567 & 416.967. In determining RFC, the ALJ can consider a variety of factors including a treating physician's or examining physician's observations of limitations, the claimant's subjective allegations of pain, physical and mental abilities, as well as the limiting effects of all impairments even those not deemed severe. *Id*. at §§ 404.1545(a) & 416.945(a). Where an

individual has multiple impairments, all such impairments will be considered in assessing the RFC. *Id*. at §§ 404.1545(a)(2) & 416.945(a)(2).

Here, in assessing Plaintiff's RFC, the ALJ considered the medical evidence of record and determined that the Plaintiff had the RFC for

> the full range of light work, except the claimant is limited to work allowing him to alternate between sitting and standing as needed, requiring no production pace work, no communication in English, and consisting of simple routine tasks.

Tr. at p. 84.

The Plaintiff objects to this RFC on several grounds, particularly that the ALJ did not adopt and afford controlling weight to the opinions of his treating physician, Dr. Ted Triana. Pl.'s Br. at p. 14. Instead, the ALJ gave only probative weight to Dr. Triana's opinion, while affording great weight to the opinion of consultive examiner Dr. Kalyani Ganesh. The ALJ's decision in this regard, however, is highly detailed regarding the specific medical examinations and findings relied upon in support of his decision to only assign "probative weight" to Dr. Triana's statements regarding claimants limitations. Tr. at p. 89. Furthermore, a review of the record discloses substantial evidence for the ALJ's conclusion.

Under the Regulations, a treating physician's opinion as to the nature and severity of a claimant's impairment is entitled to "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2); *see also Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999).[3] However, "[a] treating physician's statement that the

---

[3] A "treating physician" is the claimant's "own physician, osteopath or psychologist (including outpatient clinic and health maintenance organization) who has provided the individual with medical treatment or evaluation, and who has or had an ongoing treatment and physician-patient relationship with the individual." *Jones v. Apfel*, 66 F. Supp. 2d 518, 524-25 (S.D.N.Y. 1999) (quoting *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988)).

claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *see also* 20 C.F.R. §§ 404.1527(e)(1) & 416.927(e)(1) (Commissioner provides the ultimate decision on disability). Moreover, treating physician opinions are not controlling if contradicted by other substantial evidence in the record, including the opinions of other medical experts. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). Where conflicts arise in the medical evidence, resolution of such is properly entrusted to the Commissioner. *Veino v. Barnhart*, 312 F.3d at 588 (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). The treating physician doctrine recognizes that a claimant's treating sources, which in most cases are medical professionals, are more apt to "provide a detailed, longitudinal picture of [the patient's] medical impairment(s) and may bring a unique perspective to the medical findings" as opposed to an evaluation by a one-time non-examining, non-treating physician. 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993).

In deciding what weight to give medical opinions or portions thereof, the ALJ may consider a variety of factors including: 1) length of the treatment relationship and frequency of examination; 2) the nature and extent of the treatment relationship; 3) the amount and type of support provided by the treating source for his or her opinion; 4) how consistent the opinion is with the record as a whole; 5) whether the treating physician is a specialist; and 6) any other factors which tend to support or contradict the treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2)); *Zongos v. Colvin*, 2014 WL 788791, at *9 (N.D.N.Y. Feb. 25, 2014); *Christy v. Comm'r of Soc. Sec.*, 2015 WL 6160165, at *8 (N.D.N.Y. Oct. 20, 2015).

Additionally, where a claimant's medical record is incomplete, the ALJ has a duty to develop the administrative record. *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996); *see also* 20 C.F.R.

§§ 404.1512(d) & 416.912(d). The Regulations state that prior to an ALJ deciding that a claimant is not disabled, he or she will "develop [the claimant's] complete medical history" and "make every reasonable effort to help [the claimant] get medical reports from [his or her] own medical sources." 20 C.F.R. §§ 404.1512(d) & 416.912(d). The evidence in a claimant's case record must be "complete and detailed enough to allow [the Commissioner] to make a determination or decision about whether [a claimant is] disabled[.]" *Id.* at § 404.1513(e) & 416.913(e). Yet, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d at 79 n.5 (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)). "Ordinarily, development should not be undertaken for the purpose of determining whether a treating source's medical opinion should receive controlling weight if the case record is otherwise adequately developed." Social Security Ruling No. 96-2p, *Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions,* 1996 WL 374188, at *4, (S.S.A. 1996). Where opinion evidence is inconsistent, the ALJ weighs the relevant evidence and decides whether a determination on disability can be made. 20 C.F.R. §§ 404.1520b(b) & 416.920b(b).

On November 16, 2010, Dr. Triana completed a form entitled "Medical Examination for Employability Assessment, Disability Screening, and Alcoholism/Drug Addiction Determination". Tr. at pp. 304-06. The evidence establishes that Mr. Matos was treated by Dr. Triana on approximately five occasions prior to the issuance of this form, *id*. at pp. 311, 314, 317, 320, & 323, and on seven occasions from November 2010 to the date of the ALJ's decision. *Id*. at pp. 308, 492, 517, 520, 524, 527, & 530. In that form, Dr. Triana opined that Mr. Matos was "very limited" in

the activities of lifting, carrying, pushing, pulling, bending, seeing, hearing, speaking, stairs or other climbing, understanding and remembering instructions, maintaining attention and concentration, taking simple decisions, and could have no stress related activities at work. *Id*. at pp. 305-06. In addition, the form indicates that the Plaintiff was moderately limited in walking, standing, sitting, and carrying out instructions. *Id*. The medical conditions that were listed for Mr. Matos were a subdural hematoma, left parietal, encephalomalcia, arachnoid cyst, COPD, and chronic back pain. *Id*. at p. 304. All conditions were listed as permanent, with a guarded prognosis. *Id*.

The ALJ determined that Dr. Triana's statements regarding Plaintiff's limitations were only entitled to "probative weight" because "his reports regarding the severity of [Plaintiff's] limitations are not entirely consistent with the medical record or the findings of other sources in the record." *Id*. at pp. 89-90. I find this conclusion to be supported by substantial evidence.

With regard to Plaintiff's activities, Mr. Matos indicates he was laid off from employment in 2003, and presently lives with his twenty-two-year-old son. *Id.* at p. 46. He was married but is presently single. *Id.* at pp. 510-11. His activities include watching movies, going to church, walking, cooking, doing laundry, and going up and down stairs. *Id.* at pp. 52-57. He shops for groceries and can lift a maximum of fifty pounds. *Id.* at p. 54. He has a driver's license, but does not presently drive because he has no car, so he utilizes public transportation. *Id.* at p. 47.

At the hearing, Mr. Matos detailed his subjective complaints. He reported that he has a full scale IQ of sixty-one. *Id.* at p. 44. He has back pain that he feels every time he sits or bends. *Id.* at p. 49. He can stand for one-to-two hours before he needs to rest, and would work standing then sitting. *Id.* at pp. 55 & 57. Mr. Matos indicated that he felt depressed, that his son would comment on his absentmindedness, and that at one point he had considered suicide. *Id.* at p. 57-58. He takes

medication for his back and for his mood, and indicated that it helps. *Id*. at pp 50-51. He also testified to headaches, a head injury, problems with his blood pressure, cholesterol, stomach pains, and a hernia. *Id*. at pp. 58-59.

With regard to a course of treatment, the medical records are appropriately set forth in the Parties' briefs. Broken down by medical issue, the first record of back pain in the record was on June 13, 2006, when Plaintiff visited the emergency room complaining of a history of abdominal and back pain that occurred on and off for years. *Id*. at p. 401-05. At the time of the ER visit, Plaintiff was employed doing heavy lifting in a graveyard.[4] *Id*. The diagnosis was one of lumbar strain, and the Plaintiff was recommended for "light-duty." *Id*. at pp. 403-05.

In March 2008, Plaintiff was seen again at the ER for other issues; at that time it was noted that he had no sensory defects and all extremities moved without difficulty. *Id*. at p. 481. No mention was made of back issues at medical visits dated April 14, 2008, June 3, 2008, September 3, 2008, November 4, 2008, November 15, 2008, February 17, 2009, March 31, 2009, July 9, 2009, August 18, 2009, January 14, 2010, and February 3, 2010. *Id*. at pp. 323, 330-32, 334, 337, 364, 379, 386, 469, 474, & 478.

On March 25, 2010 and June 10, 2010, the Plaintiff reported tingling and numbness in his right side, arms, legs and head. *Id*. at pp. 317 & 320. He reported chest pain and chronic lower back pain on August 3, 2010, which was better after taking medication. *Id*. at p. 345. No indication of back pain is noted on the next medical visit on November 5, 2010, which was the last medical visit before Dr. Triana's assessment. *Id*. at p. 311.

With regard to objective tests, an x-ray conducted in June 2006 of the Plaintiff's spine

---

[4] This fact, of course, contradicts the Plaintiff's claim that he last worked in 2003.

disclosed end plate spurring at multiple disc levels, but was otherwise normal. *Id*. at p. 410. An x-ray performed in March 2008 noted mild degenerative changes of the spine. *Id*. at p. 485. Another x-ray conducted in February 2011 found sacralization of L5 on the left with a pseudoarthrosis to the left sacral ala, which could be independently symptomatic, and minimal disc degeneration without spondylolysis, spondylolisthesis, or fracture. *Id*. at p. 457. In March 2011, a lumbosacral spine x-ray showed no significant bony abnormality. *Id*. at p. 435. In December 2011, a lumbar spine MRI study showed a L4-5 right foraminal and far lateral disc bulge approaching the existing right L4 nerve root, right L4 -5 and L5-S1 mild facet degeneration, which could give rise to local back and buttock pain but was not generally associated with radiculapathy, and mildly diminished bone marrow signal, possibly related to low grade anemia. *Id*. at p. 486.

An internal medicine examination was conducted by Kalyani Ganesh, with the aid of an interpreter, on March 4, 2011. *Id*. at pp. 431-35. With regard to the musculoskeletal exam, Dr. Ganesh found full flexion, extension, lateral flexion bilaterally, full rotary movement bilaterally, and the SLR test was negative bilaterally. *Id*. at p. 433. Based upon the examination and the detailed medical history, Dr. Ganesh opined that the Plaintiff's conditions did not cause any gross physical limitations in sitting, standing, walking, or using his upper extremities. *Id*. at pp. 431-35.

Utilizing the forgoing history and medical treatment of Plaintiff's back condition, the ALJ did not err when he assigned great weight to the opinion of Dr. Ganesh, as it was well supported by the objective evidence and not inconsistent with the record as a whole, and only probative weight to Dr. Triana. *Id.* at p. 89. The record is clear that Plaintiff had only conservative treatment; the objective tests revealed findings only mild in nature; and Plaintiff experienced good results from his medication. Thus, the ALJ weighed these medical opinions appropriately and his finding that

*-12-*

Plaintiff could perform light work, with a sit/stand option, is supported by substantial evidence.

With regard to the Plaintiff's migraines and brain issues, the medical notes from 2008 reflect that Plaintiff had been complaining of headaches for two years.[5] *Id*. at p. 480. An MRI performed in March 2013 indicated the presence of a subdural hematoma with minimal mass effect, and an Aracnoid cyst on the Left Middle Cranial Fossa. *Id*. A March 28, 2010 CT of the head showed atrophy out of proportion to the Plaintiff's age; left skull hypertrophy; and no other evidence of acute intercranial process or of bleed. *Id*. at p. 481. He was discharged to go home. *Id*. A follow-up CT showed no evidence of acute hemorrhage but disclosed a crescent shaped calcification along the inner table of the left parital bone which could be related to an old calcified subdural hematoma. *Id*. at p. 379. After a neurological assessment, it was recommended that the Plaintiff start Elavil. *Id*. at p. 333. He denied headaches in February 2009. *Id*. at p. 478. However, he sought medical treatment in August of that year, complaining of headaches, blurry vision, either right or left sided weakness. *Id*. at p. 472. Thereafter, a closed MRI was done by CNY which showed no significant change since the November 17, 2008 test. *Id.* at p. 455. Six months later, on January 14, 2010, Plaintiff went to Upstate University Hospital with a five day history of headaches. Importantly, it was noted that Plaintiff's headaches had improved with the prescription of Elavil, but Plaintiff had not been taking the medication for the last few months. *Id*. at p. 330. Medication was again prescribed. *Id*. at pp. 331 & 350. A follow-up in November 2010 revealed that Plaintiff was having one headache per month, which he easily slept off, and that he was comfortable with his current medication regimen. *Id.* at p. 326.

---

[5] A neurological history was obtained by Upstate University Hospital in November of 2008, which disclosed that Plaintiff had experienced headaches for over ten years, which means this condition would have existed during the entire time when Plaintiff was employed as an assembler. Tr. at p. 332.

Based on the foregoing, it was within the proper discretion for the ALJ to conclude that the record did not evidence physical limitations as a result of Plaintiff's left parietal subdural hematoma and encephalomalacia, in that the headaches and dizziness were well controlled with medication when Plaintiff is compliant with treatment. Plaintiff's counsel assigns error on the grounds that the symptoms of dizziness and headaches are not the result of hypertension, as implied by the ALJ, but rather of his brain condition. Pl.'s Br. at p. 19. The Court finds that there is no material error concerning origin because, no matter what the cause, the symptoms are well controlled with medication. *Id.* at p. 59 ("I take a medicine that is for blood pressure and it lowers it and decreases the pain.").

Finally, with regard to Plaintiff's mental issues and his depression, the ALJ also appropriately assessed the medical record as a whole when assessing the weight of the opinions. Plaintiff was seen by Dr. Jeanna Shapiro for a psychiatric examination on March 4, 2011, and she noted that he had no history of prior psychiatric hospitalizations or treatment. *Id.* at p. 426. Plaintiff maintained that he was depressed, frustrated, forgetful, and has difficulty concentrating. *Id.* at p. 427. He was cooperative with regard to questioning, but his intellectual functioning was estimated to be in the deficient range. *Id.* Dr. Shapiro concluded that Mr. Matos was capable of understanding and following certain instructions, so long as they are provided in Spanish; was capable of performing simple tasks; and could maintain attention or concentration for tasks. *Id.* at p. 429. Dr. Shapiro has no diagnosis for Axis I, and a rule-out mental retardation for Axis II. *Id.* at 429.

Mr. Matos was also seen by a state agency psychological consultant, Dr. Kamir, in March of 2011. Dr. Kamir concluded that Plaintiff would be able to perform a full range of simple and semi-skilled tasks. *Id.* at p. 452.

*-14-*

On July 6, 2012, Plaintiff was seen by Dr. Coleman for a psychological evaluation. *Id.* at pp. 494-97. Mr. Matos related that he could not work due to his back pain and hypertension, and that he had headaches. *Id.* at p. 496. Testing disclosed a full scale IQ score of sixty-one. *Id.* Dr. Coleman noted that the cognitive delays seen in Mr. Matos often result in placement of an individual in a sheltered workshop or sheltered community-based employment activity. *Id.* at p. 497. Dr. Coleman makes reference to the "neurological findings" without reference to what was reviewed, or to his expertise in this area. *Id.* at pp. 497 & 501. Dr. Coleman found that Plaintiff could not meet competitive standards for remembering work-like procedures; understanding and remembering short and simple instructions; and dealing with normal work stress. *Id.* at p. 499. In sum, Plaintiff would be off-task more than twenty percent of the time. *Id.* at 500.

With regard to Plaintiff's depression, Plaintiff was able, after several visits, to complete an assessment with the Bienestar Bilingual Counseling Center, where he was diagnosed with depression. *Id.* at pp. 507-12. However, he was ultimately discharged after two sessions due to his unwillingness or inability to commit the time necessary to make progress in therapy. *Id.* at p. 507. Plaintiff acknowledged at the ALJ Hearing that he no longer goes to counseling, but he takes medicine that controls his anger and makes him feel better. *Id.* at pp. 51 & 58.

It is the ALJ's responsibility to reconcile the conflicting medical opinions with the totality of the evidence in the record. With regard to Plaintiff's mental impairments, the ALJ did so as follows:

> I find that both examinations and subsequent psychological reports are generally supported by the record. The limitations set forth by Dr. Shapiro regarding the claimant's functioning are consistent with the claimant's presentation in the objective medical evidence, whereas, Dr. Coleman's opinions regarding the claimant's abilities show significant restrictions in even the most basic functioning. I find that the limitations reported by Dr. Coleman are not entirely supported by the objective

> evidence, particularly the claimant's presentation during appointments, his reported abilities and the function reports or his appearance and abilities noted during the hearing. As such, I assign greater weight to the opinion of Dr. Shapiro, rather than that of Dr. Coleman, particularly with regard to the claimants degrees of functioning in spite of his mental conditions.

*Id.* at p. 90

I find that it was not improper for the ALJ to view the evidence as he did. He was in the best position to observe the Plaintiff at the hearing, and it is clear that there were inconsistences between the severe limitations assigned by Dr. Coleman due to Plaintiff's mental restrictions, and the Plaintiff's work history and activities of daily living. Despite issues of the brain that at many points were felt to be congenital, long standing and stable, Plaintiff held jobs, raised a family, and attended to all his activities of daily living. Plaintiff points to an alleged error in not accepting the mental functioning assessment of Dr. Triana and Dr. Coleman, rather than of Dr. Shapiro, because the former opinions comport with the opinion of the State Agency Doctor, Dr. Kamin, and the latter does not. Pl. Brief at pp. 15-17. This position is based upon an incorrect reading the record. While Dr. Kamin noted some moderate limitations in the ability to understand and carry out detailed instructions, *id*. at p. 450, his final assessment was that the Plaintiff can perform a full range of simple and semi-skilled tasks, *id*. at p. 452. That opinion is certainly not consistent with the view of Dr. Coleman, who felt that Mr. Matos would be unable to remember work like procedures, sustain an ordinary routine without supervision, or remember and carry out even short or simple instructions. *Id*. at p. 499.

Finally, to the extent Plaintiff claims the ALJ erred by not fully developing the record, I am satisfied that there are no clear and obvious gaps in the medical record which would warrant a finding of error and remand. The ALJ has the obligation to develop the record for the twelve months preceding the date when a claimant files his application; in this case, that obligation was fulfilled.

There was no requirement to seek, for example, the Auburn Memorial Hospital records between July of 2003 and June of 2006. The medical record relied upon by the ALJ, which extends from June of 2006, to the time of the decision, adequately sets forth Plaintiff's complete medical history. Dr. Kim, Dr. Bradshaw, and Dr. Simionescue, all saw the Plaintiff on a single occasion, *id.* at pp. 326-29 & 472-73, and therefore there was no additional requirement that a medical source statement be obtained in light of the voluminous record already obtained, *see Tankisi v. Comm'r of Social Sec.*, 521 F. App'x 29 (2d Cir. 2013); *see also* 20 C.F.R. § 404.1527(c)(2).

## 2. The ALJ's Credibility Determination

In his written decision denying disability benefits, the ALJ determined that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credibl[.]" Tr. at p. 89. Plaintiff contends this finding is in error.

A plaintiff's allegations of pain and functional limitations are "entitled to great weight where . . . [they are] supported by objective medical evidence." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (quoting *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir.1992)). However, the ALJ "is not required to accept [a plaintiff's] subjective complaints without question; he may exercise discretion in weighing the credibility of the [plaintiff's] testimony in light of the other evidence in the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). "When rejecting subjective complaints, an ALJ must do so explicitly and with sufficient specificity to enable the court to decide whether there are legitimate reasons for the ALJ's disbelief." *Rockwood v. Astrue*, 614 F. Supp. 2d at 270.

"The ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence

in the record. First, the ALJ must determine whether the claimant has medically determinable

impairments, which could reasonably be expected to produce the pain or other symptoms alleged."

*Id.* at 271.

> Second, if medically determinable impairments are shown, then the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's capacity to work. Because an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, an ALJ will consider the following factors in assessing a claimant's credibility: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.

*Id.*; *see also* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) & 416.929(c)(3)(i)-(vii).

Further, "[i]t is the role of the Commissioner, not the reviewing court, 'to resolve evidentiary

conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a

claimant's symptoms." *Cichocki v. Astrue*, 534 F. App'x 71, 75 (2d Cir. 2013) (quoting *Carroll v.*

*Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)).

Plaintiff testified at the hearing that he felt back pain every time he would sit or bend. Tr.

at p. 49. He testified that he could only stand for one-to-two hours before he had to rest. *Id.* at p.

55. Plaintiff was insistent with Dr. Colemen that he could not work due to his back pain problems

and his high blood pressure. *Id.* at pp. 494 & 496. And, according to the Plaintiff's counsel,

Plaintiff has constantly sought treatment for unbearable headaches. Pl. Brief at p. 19.

Notwithstanding Plaintiff's contentions, the Court agrees with Defendant's counsel that the

totality of the medical evidence, summarized in this decision, does not fully support the Plaintiff's

subjective claims set forth in the hearing and to his medical care providers, and thus the ALJ's

decision in this regard was appropriate. Plaintiff has generally had conservative treatment for his back pain, migraines, and his depression, which were generally effectively treated with medication when he was compliant in taking it. There is no evidence of any serious side effects to the medication, as implied by Plaintiff's counsel in the Brief. *Compare* Pl.'s Br. at p. 20 *with* Tr. at p. 326. Accordingly, I find that in assessing Plaintiff's credibility, the ALJ employed the correct legal standards and his finding is supported by substantial evidence.

### 3. *Step Four – Past Work*

Plaintiff alleges that the ALJ erred when he failed to make specific findings regarding the physical and mental demands associated with the claimant's past work, and compare those demands with the claimant's RFC. Pl.'s Br. at p. 21; *see also* Social Security Ruling No. 82-61, *Titles II and XVI: Past Relevant Work-The Particular Job or the Occupation as Generally Performed,* 1982 WL 31387 (S.S.A. 1982); Social Security Ruling No. 82-62, *Titles II and XVI: A Disability Claimant's Capacity to do Past Relevant Work, In General,* 1982 WL 31386 (S.S.A. 1982).

Once the demands of the claimant's past relevant work are ascertained, the ALJ must identify the claimant's ability to perform the specific work-related abilities on a function by function basis. Social Security Ruling No. 96-8p, *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *1 (S.S.A. 1996). In his decision, the ALJ stated as follows:

> The vocational expert testified that the claimant's work as an assembler, *D.O.T.* 706.684-022, S. V. P. 2, light exertion met the criteria required to be considered as past relevant work. In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as generally performed. The vocational expert testified that the claimant's residual functional capacity allowed for the performance of his past relevant work as an assembler. The vocational expert's testimony regarding the claimant's ability to engage in the aforementioned position was consistent with the Dictionary of

*-19-*

Occupational Titles with the exception of the inclusion of a sit/stand alternation option, which was based on the vocational expert's experience. Tr. at p. 90.

A description of the Plaintiff's past work and its requirements is not specifically contained in the ALJ decision, but is found within the record as a whole. At the hearing, Plaintiff testified that he worked from 1998 to 2003 for a company that manufactured all types of electrical equipment, fans, and heaters. *Id*. at p. 48. The Plaintiff left his position with Homes Inc. in November of 2003, not because of his inability to do the work, but rather because he was laid off. *Id*. at pp. 48 & 285. His work for the company included assembling fans and packaging them in boxes. *Id*. at p. 48. He generally did this using an electric screwdriver. *Id*. at p. 267. In his disability and function report, claimant indicated that he could not lift heavy objects and could not stand for long periods of time. *Id*. at p. 261. At the hearing he testified that he could lift fifty pounds once in a while, but not all day long. *Id*. at p. 54. He stated that he worked as an assembler eight hours per day, five days a week. *Id*. at p. 267. He indicated that the heaviest weight lifted at work was fifty pounds, but he did not indicate what was frequently lifted. *Id*. at p. 261. He did not supervise anyone in this position. *Id*. At the hearing the claimant was asked about his ability to sit and stand, and provided the following response: "I worked sitting down and I would have to get up. I would stand up, to work at the table, and would sit down again." *Id*. at p. 57.

The ALJ utilized a vocational expert ("VE"), Ms. DeStefano, to discuss claimant's past relevant work. *Id*. at pp. 61-65. Regarding the past work assembling fans, the VE referenced the Dictionary of Occupational Titles ("DOT"), Code 706.684-022. According to relevant section of

the DOT, the position is classified as light exertion, unskilled, with an SVP of 2.[6] *Id.* at p. 62. The definition is as follows:

> Performs any combination of following repetitive tasks on assembly line to mass-produce small products, such as ball bearings, automobile door locking units, speedometers, condensers, distributors, ignition coils, drafting table subassemblies, or carburetors: Positions parts in specified relationship to each other, using hands, tweezers, or powered tools. Frequently works at bench as member of assembly group assembling one or two specific parts and passing unit to another worker. Loads and unloads previously set up machines, such as arbor presses, drill presses, taps, spot welding machines, riveting machines, milling machines, or broaches, to perform fastening, force fitting, or light metal cutting operation on the assembly line. May be assigned to different workstations as production needs require or ship from one station to another to reduce fatigue factor.

*see also* Dictionary of Occupational Titles (4th ed. 1991) ("DOT") § 706.684-022, *available at* http://www.occupationalinfo.org/70/706684022.html (last visited March 15, 2016).

The DOT also defines "Light Work" as "exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible force constantly" to move objects. Dep't of Labor, Dictionary of Occupational Titles, Appendix C, 1991 WL 688702 (G.P.O. 1991).

The ALJ next inquired of the VE with regard to the Plaintiff's ability to do past work of the general nature of assembler, taking into consideration the limitations of the claimant that he felt were established by the record. The VE's testimony was that an individual the same age as Plaintiff, with the same vocational profile, and a light exertional level, with a stand/sit option, no production rate or pace work, doing simple routine tasks, with no communication in English, would be able to do the job as an assembler. Tr. at p. 62. The VE, having listened to the claimant's prior testimony, concluded that he could stand when needed at his prior work. *Id.* Moreover, even with an additional

---

[6] "SVP" stands for "Specific Vocational Preparation" and refers to the "amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." The Dictionary of Occupational Titles (4th ed. 1991), App. C, Components of the Definition Trailer. Such training can be acquired in a school, work, military, institutional, or vocational environment. An SVP of 7 indicates that vocational preparation would take over two years "up to and including" four years. *Id.*

ten-to-fifteen minute break necessitated by Plaintiff's condition, he nevertheless would be employable. *Id*. at p. 63.

Although the description of the past relevant work in the ALJ decision itself is sparse, the testimony of the VE, the reference to the DOT title, and the Plaintiff's own statements regarding his activities, both in his application and at the hearing, are sufficient. In addition, and as noted by the Defendant, in order to survive Step Four, the claimant has the burden to show an inability to return to his previous specific job and inability to perform his past relevant work generally. This inquiry requires separate evaluations of the previous specific job and the job as it is generally performed. *Jasinski v. Barnhart,* 341 F.3d. 182, 185 (2d Cir. 2003). In determining whether a claimant can perform his past relevant work as it is generally performed, "[t]he inquiry. . . is not whether the claimant is able to perform the duties of [his] previous job, but whether the claimant is able to perform the duties associated with [his] previous "type" of work." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (finding that the plaintiff could perform her prior work as a computer operator because she could perform the sedentary work required of her "previous 'type' of work," even though she could not continuously sit for eight hours as specifically required by her previous job (citation omitted)).

The Second Circuit is also clear that merely because a VE's testimony may not precisely match the definition contained in the Dictionary, it is not a basis to overturn an ALJ's decision. *Jasinski v. Barnhart*, 341 F.3d at 185. "Whereas the dictionary describes jobs as they are generally performed, an expert is often called upon to explain the requirements of particular jobs, and as such, his deviations from the dictionary in such testimony do not actually 'conflict' with the dictionary. Many specific jobs differ from those jobs as they are generally performed, and the expert may

identify those unique aspects without contradicting the dictionary." *Id.* In the present case, while it is true that the DOT section does not include a "stand/sit option", there is no prohibition upon relying on a VE expert at the hearing to provide evidence concerning the availability of a certain job in the national economy. Indeed, where stand/sit option may erode the availability of a job base nationally, testimony of a VE is essential. *See* Social Security Ruling No. 83-12, *Program Policy Statement: Titles II and XVI: Capability To Do Other Work – The Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work*, 1983 WL 31253, at *4 (S.S.A. 1983)

In light of the above, the ALJ's findings that Plaintiff could perform his past relevant work as an assembler, as generally and specifically performed, with the addition of a sit/stand option, was sufficient to negate a finding of disability at Step Four.

### 4. The Appeals Council's Decision and New Evidence

Plaintiff alleges that he submitted new evidence to the Appeals Council that was material, and required remand to the ALJ. Pl.'s Br. at p. 22. Pursuant to the regulations, when it receives new evidence, the Appeals Council:

> shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R. §§ 404.970(b) & 416.1470; *see Rutkowski v. Astrue,* 368 F. App'x 226, 229 (2d Cir. 2010).

"While evidence submitted to the Appeals Council becomes part of the administrative record . . . the Appeals Council, in reviewing a decision based on an application for benefits, will consider new evidence only if (1) the evidence is material, (2) the evidence relates to the period on or before the

ALJ's hearing decision, and (3) the Appeals Council finds that the ALJ's decision is contrary to the weight of the evidence, including the new evidence . . . ." *Rutkowski v. Astrue*, 368 F. App'x at 229 (citing *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996) & 20 C.F.R. § 416.1470).

The Appeals Council considered the new evidence but ultimately determined that there was no basis to change the ALJ ruling. Tr. at p. 5 & 8. Plaintiff's new evidence included additional treatment notes from the Family Care Medical Group and also records from the Bienestar Bilingual Counseling Center. *Id*. Defendant's Counsel correctly notes that, in fact, the counseling records were already considered by the ALJ. Tr. at pp. 89 & 507-12. And, it is clear the ALJ reviewed these records in light of his remark that the Plaintiff discontinued counseling as a result of attendance problems. *Id*. at p. 89.

Of the remaining records, these consist of five visits with Plaintiff's treating physician, Dr. Ted Triana. *Id*. at pp. 517-32. One of the notes was already in the record, and a second note was for a visit *after* the date the of ALJ decision. *Id.* at pp. 492-93, 517-19, & 530-32. With regard to the remaining three office notes from Dr. Triana, the February 28, 2013 visit was for chest and back pains, with a denial of any headache and an assessment of benign hypertension, *id.* at pp. 520-22; and the January 2, 2013 report noted that the Plaintiff reported neck pain but denied headaches or chest pains. With regard to Plaintiff's back, there was no cervical or lumbar lordosis, no kyphosis, or scoliosis. *Id*. at pp. 524-25. Lastly, the December 18, 2012 report deals with a hypertension follow-up. During that visit, the Plaintiff also reported headaches, numbness in the right side of his head, and burning pain in his abdomen region. He also showed limitation and forward and lateral flexion. *Id*. at pp. 527-29. "[B]ack hygiene" and exercise techniques to strengthen the back muscles were discussed. *Id*. at p. 529.

Having reviewed the records, the Court agrees with the Defendant that the new notes are cumulative of what was already before the ALJ, and thus no error occurred when the Appeals Council declined review.

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Commissioner's decision denying disability benefits be **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date:   March 15, 2016
        Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge

*-25-*